UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 4:10-cv-10041-KMM/Becerra

JOHN E.D. GRUNOW, JR. and O.R. GOLF
PARTNERS, LTD, as assignees of EDWARD
WILLIS, JR, and EDUARDO WILLIS, III,
d/b/a WORMMY'S,

     Plaintiffs,

v.

NOVA CASUALTY COMPANY,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**[1]
**ON LATHAM, LUNA, EDEN, AND BEAUDINE, LLP'S AMENDED MOTION TO**
**ENFORCE CHARGING LIEN AND INCORPORATED MEMORANDUM OF LAW**

**THIS MATTER** is before the Court on Claimant Latham, Luna, Eden, and Beaudine,

LLP's (the "Law Firm") Amended Motion to Enforce Charging Lien (the "Amended Motion").

ECF No. [67]. Plaintiffs John E.D. Grunow Jr. ("Grunow") and Harbor Course Properties, LLC

("HCP"), as successor in interest by merger to O.R. Golf Partners, Ltd., (collectively "Client"),

filed their Response in Opposition to the Amended Motion (the "Opposition"), ECF No. [69], and

the Law Firm filed its Reply (the "Reply"), ECF No. [73]. An evidentiary hearing was held before

the undersigned on May 28, 2021, ECF No. [86], and on June 4, 2021, ECF No. [88]. After due

consideration of the briefings, the evidence presented at the hearings, the pertinent portions of the

record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that

_____

[1] The Honorable Michael K. Moore, United States District Judge, referred this case to the
undersigned for a report and recommendation on the matter. ECF No. [62].

the Law Firm's Motion, ECF No. [67], be **GRANTED in part** and **DENIED in part**.  The Law Firm is entitled to $1,012,496.99.

## I.  BACKGROUND

The professional relationship between the Law Firm and the Client began almost twenty years ago when the Law Firm represented the Client in state court negligence actions arising from alleged illegal mangrove cutting on the Client's property located in Ocean Reef and on approximately three acres of federally protected land in John Pennekamp State Park.  ECF Nos. [67] at 3, [94] at 6:17–7:11.  The initial lawsuits were brought by the Client against the Client's contractor, the cutters retained by the contractor to perform the cutting, and neighbors and other cutters alleged to have done additional unlawful cutting (the "Liability Action").  ECF No. [94] at 7:19–8:11.  In the Liability Action, the Client sought damages including the attorneys' fees and costs incurred by the Client in the criminal and civil actions brought against it as a result of the mangrove cutting.  ECF Nos. [67] at 3–4.  The Liability Action, which spanned over eight years, resulted in a settlement agreement between the Client and the cutters that included a $5.5 million *Coblentz* consent judgment and an assignment of the cutters' rights against their insurance company, Nova Casualty Company ("Nova").  *Id.* at 4; ECF No. [94] at 9:7–24, 15:20–22.

On October 25, 2007, Nova filed a declaratory judgment action in state court seeking a determination that Nova did not owe a duty to defend or indemnify the cutters in the Liability Action (the "Declaratory Judgment Action").  ECF No. [67] at 4.  Following cross-motions for summary judgment, the trial court entered an order granting each motion in part.  *Id.*  Nova filed an appeal, and the Third District Court of Appeal affirmed the trial court's order regarding the elements of damages covered under the Policy.  *Nova Cas. Co. v. Willis*, 39 So. 3d 434, 437 (Fla. 3d DCA 2010).  However, the Third District rejected the portion of the trial court's ruling which provided that Nova would be responsible for all the damages if it was not possible to apportion

2

damages between the cutting on the Client's own property and the cutting on the government's land.  *Id.*  Nova appealed to the Florida Supreme Court, which declined to accept jurisdiction. *Nova Cas. Co. v. Willis*, 51 So. 3d 466 (Fla. 2010).

On April 12, 2010, the Client filed the instant bad faith action against Nova in state court, which was later removed to this Court (the "Bad Faith Action").  ECF No. [1].  On July 7, 2010, the District Court entered an Order abating the case pending a final resolution of Nova's Declaratory Judgment Action in state court.  ECF No. [11].  The Declaratory Judgment Action continued through July 11, 2016, when the state trial court determined that the Client was entitled to $1,633,753.12 in covered damages.  ECF No. [22] at 5–10.  Thereafter, the Client filed its motion to lift the stay, which the District Court granted on April 16, 2019, ECF No. [23].

On March 4, 2020, two months before the case was set for trial, Nova and the Client attended a mediation where they reached a complete settlement of the Bad Faith Action before this Court.  ECF No. [53].  After the settlement, a dispute arose between the Law Firm and the Client. ECF No. [60] at 1–2.  Specifically, on March 6, 2020, the Law Firm provided the Client its final invoice including time billed through February 28, 2020.  ECF No. [68-5] at 2–8.  It also presented the Client with its calculation of the fees it had deferred and a premium to which it was entitled to in accordance with the terms of an agreement that the parties had reached in 2013.  *Id.* at 9–11.

On March 13, 2020, the Law Firm filed a Notice of Charging Lien.  ECF No. [55].  Prior to the payment of the settlement proceeds, the Client and the Law Firm agreed to place the disputed funds into an escrow account, and the remaining settlement proceeds were disbursed directly to the Client.  ECF No. [68-5] at 22.  On April 23, 2020, the Client sent a letter to the Law Firm stating the Law Firm was not entitled to payment.  *Id.* at 69–85.  On August 28, 2020, the Law Firm filed the initial Motion to Enforce Charging Lien ("Initial Motion"), ECF No. [60], to which the Client responded, ECF No. [61], and the Law Firm replied, ECF No. [63].

On January 13, 2021, the Court held a hearing where the undersigned instructed the Law Firm to amend its Initial Motion to include the Law Firm's invoices and any other materials in support of its fees. ECF No. [66]. The parties agreed to a briefing schedule, and the Amended Motion, Opposition, and Reply were filed pursuant to that schedule.

## II.  THE AMENDED MOTION

The Law Firm now seeks to enforce its charging lien. ECF No. [67]. The Law Firm argues that it is "entitled to the entry of a judgment as a matter of law enforcing its charging lien without an evidentiary hearing." *Id.* at 10. Specifically, the Law Firm argues that it satisfied each of the elements necessary to enforce the charging lien because: (1) there is a fee agreement that forms an express contract between the Law Firm and the Client; (2) the agreement expressly provides that payment would come from the settlement proceeds; (3) the Client has attempted to avoid such payment; and (4) the Law Firm gave the Client timely notice of the charging lien. *Id.* at 10. Accordingly, the Law Firm argues that it is entitled to $1,072,724.99. *Id.* at 7–8.

In its Opposition, the Client argues that the Law Firm is not entitled to that amount on three grounds. First, the Client argues that the Law Firm breached the fee agreement the parties entered into in 2013, and therefore, should not benefit from any of its provisions. ECF No. [69] at 7–10. Specifically, the Client argues that their agreement required the Law Firm to conform its work to budgets prepared by the Law Firm and approved by the Client, and that the Law Firm both billed in excess of the amounts estimated in the budgets, and failed to get the Client's approval for these amounts. *Id.* at 9–10. Second, the Client argues that the Law Firm engaged in gross overbilling, included numerous billing entries for ministerial functions, and failed to provide details of the actual legal services performed. *Id.* at 11–12. Third, the Client contends that the Law Firm failed to identify a critical legal issue that resulted in years of wasted efforts and time for which the Law Firm should not recover. *Id.* at 13–14. In short, in the Client's view, because the Law Firm

breached the agreement with respect to its fees, it is not entitled to enforce any of the terms of the agreement.

In its Reply, the Law Firm realleges that the Client entered into an agreement whereby it deferred paying a significant portion of the Law Firm's fees, and that the agreement now entitles it to those fees plus a premium. ECF No. [73] at 2. The Law Firm maintains that it did not breach the agreement as to the budgets it proposed, arguing that it provided the Client with a "very rough estimate" and that any work in excess of the amounts proposed in the budgets was approved by the Client. *Id.* at 4. In addition, the Law Firm argues that the reasonableness of its fee is not at issue, and in any event its billing practices were not excessive or improper. *Id.* at 5. Moreover, the Law Firm argues that the Client waived any objections to the amount of the invoices by failing to raise its objections in a timely manner. *Id.* at 8. Finally, the Law Firm contends that the Client's argument that it failed to identify a critical issue in the case is meritless and, in any event, not a basis to deny its fee. *Id.* at 10.

Although the Law Firm took the position that an evidentiary hearing was not necessary, ECF No. [67] at 3, 9–10, the Client requested one to address material issues of fact as to the Law Firm's entitlement and to determine the reasonableness of the attorneys' fees, ECF No. [69] at 17. Although the Court advised the Parties during the hearing on the Initial Motion that the reasonableness of the attorneys' fees was not at issue, the Court held an evidentiary hearing to determine whether there was a breach of the agreement. At the evidentiary hearings on May 28, 2021 and June 4, 2021, the Court admitted into evidence all exhibits and appendices to the Amended Motion, the Opposition, and Reply, as well as other exhibits presented to the Court at the hearings. ECF Nos. [83], [89], [90]. In addition, the Law Firm presented the testimony of Ms. Jennifer Eden, the partner with primary responsibility over the Client's matter and who worked and billed most of the time on behalf of the Law Firm. ECF No. [94] at 5:15–6:6. The Client

called Mr. Miroslav Fajt ("Mr. Fajt"), the managing partner of HCP. *Id.* at 203:18–204:12. In addition to his position at HCP, Mr. Fajt graduated from Columbia University School of Law and has been practicing law since 1979. *Id.* at 203:24. Mr. Fajt is currently a partner at a New York law firm specializing in commercial real-estate. *Id.* at 203:18–24.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The 2013 Fee Agreement Is A Valid Contract.

Between 2002 and late 2013, the Law Firm billed the Client monthly for its work. ECF Nos. [68-2] at 25–26, [91–1] at 1–7. Starting in 2012, the Client stopped making payments to the Law Firm, despite numerous requests for payment and offers of substantial discounts. ECF No. [68-2] at 1, 3, 7, 9–13. Based on the Client's stated concerns regarding its cash flow and noting that significant legal work in the case was still needed, the Client approached the Law Firm about the possibility of entering into a revised fee agreement. ECF Nos. [68-2] at 9–16, 19, 24, 27–28; [90-1] at 8–9; [94] at 204:17–23, 206:1–6; [93] 6:16–21.

Contrary to the argument presented in the Client's Opposition, ECF No. [69] at 5, Mr. Fajt admitted that he presented the proposed terms of a fee agreement to Ms. Eden, including sample calculations of what the Firm could expect to recover under his proposal. ECF Nos. [90-1] at 8–9; [94] at 206:12–15. Specifically, in a letter dated August 13, 2013, Mr. Fajt proposed a "partial contingency" which he stated he had successfully implemented with other law firms. ECF Nos. [90-1] at 8–9; [94] at 217:5–9. Mr. Fajt proposed that the Law Firm:

> apply a discount of 50% to the fees at the rates reflected in the budget [the Law Firm provided]. The amount of the discount would be carried forward and one half of that discount would be paid from the first proceeds of any collection or settlement up to the policy limitation of $1 million. The balance of the discount (i.e., 25% of the amounts billed) would be paid from the first proceeds on any collection or settlement above the $1 million policy limit. In addition, [the Law Firm] would receive a premium of 100% of this remaining discount.

6

ECF No. [90-1] at 8.   At the evidentiary hearing, Mr. Fajt testified that he proposed the arrangement because the Client "needed to be able to budget and source the funds to continue funding [the] lawsuit."  ECF No. [94] at 205:2–3.  He also stated that the Client needed to assess whether it should spend money in the hopes of recovering more money, and wanted a more efficient way to manage the case "so that bills wouldn't just arrive and catch us by surprise."  *Id.* at 207:20–21, 211:15–16; *see* ECF No. [93] 25:23–25.

On September 16, 2013, the Law Firm responded, accepting certain terms of the Client's proposal, and including a counterproposal on other terms, including that the Law Firm would collect slightly more than the 50% of its full rates if the Client agreed to pay within thirty days of receiving an invoice.  ECF No. [90-1] at 2–3.  On October 24, 2013, Mr. Fajt sent Ms. Eden an email agreeing to go forward but with certain "clarifications/modification."  *Id.* at 5.

The parties do not dispute that these communications resulted in an enforceable agreement (the "Fee Agreement"), nor are the terms of it in dispute.  The key terms are as follows:

(1) Ms. Eden's hourly rate would be discounted from $450.00 to $285.00, and Cristina Taylor's ("Ms. Taylor") hourly rate would be discounted from $285.00 to $235.00 ("Discounted Rates").  *Id.* at 2.

(2) For the first $1 million recovered by the Law Firm, the Client was to pay the Law Firm one-half of the difference between the discounted rate and the regular rates of Ms. Eden ($82.50) and Ms. Taylor ($25.00).  *Id.*

(3) For any recovery over $1 million, the Client was to pay the remaining one-half of the deferred fees ($82.50 for Ms. Eden and $25.00 for Ms. Taylor) (the "Deferred Fees").  *Id.* at 2–3.

(4) If the recovery was over $1 million, the Client would pay a premium which amounted to 100% of the Deferred Fees (i.e., an additional $82.50 for Ms. Eden and $25.00 for Ms. Taylor) (the "Premium Fees").  *Id.*

(5) The Client was to pay the Law Firm's monthly invoices within thirty days of receipt.  *Id.* at 3.

(6) If the Client had any questions or issues regarding an invoice, the Client was to pay the portion of the invoice, if any, that was undisputed, and advise the Law Firm of its concerns with the disputed amounts within thirty days. *Id.* at 5.

(7) If the Client failed to pay any undisputed monthly invoice within the thirty days, the regular hourly billing rates for Ms. Eden and Ms. Taylor would be reinstated and neither the Deferred Fees nor the Premium Fee provisions of the Fee Agreement would apply to any future bills. *Id.*

(8) The Law Firm was to do its "very best" to manage the costs within the budget and was to advise the Client if there was a need for any meaningful departures from the budget. The Client would assume the case was on budget unless the Law Firm advised otherwise. *Id.*

(9) If the Law Firm advised that a cost or task might take the matter above the budget in a "meaningful way," the Client would decide whether to incur the additional costs. *Id.* If the Client agreed, the budget would be effectively modified to that extent. *Id.* If the Law Firm failed to advise the Client in advance of a "meaningful" departure from the budget, the amount of the bill that exceeds the budget would have to "be discussed" and the parties would "have to mutually agree on an equitable resolution of such excess." *Id.* In the event of any such dispute, the Fee Agreement would remain in place until the parties reached a resolution. *Id.*

**B. The Client Made Timely Payments Under the Fee Agreement Until After The Settlement Was Reached And The Law Firm Demanded Its Deferred and Premium Fees.**

From the Fee Agreement's inception until the Bad Faith Action settled in 2020, the Law Firm invoiced the Client monthly. ECF Nos. [67] at 7, [67-1] at 19–246. In total, the Law Firm sent eighty-two invoices to the Client and each was paid within thirty days. ECF No. [67] at 7.

After the settlement was reached, the Law Firm sent the Client its last invoice which totaled $153,200.99, including disbursements. ECF No. [68-5] at 4. In addition to the last invoice, the Law Firm also demanded $967,962.00 in Deferred and Premium Fees and provided various charts and documents in support of that request. *Id.*; ECF No. [90-1] at 25. As to the Deferred and Premium Fees in particular, the Law Firm provided the following calculations:

The Firm will receive ½ of its difference on the discounted rate $165.00 per hour ($82.50) for Jennifer Eden[2] and ½ of the difference on the discounted rate $50 per hour ($25.00) for Christina Taylor for the first $1 million recovered.

| Timekeeper | Rate | Number of Hours | Total Due |
|---|---|---|---|
| Jennifer Eden | $82.50 | 3,045.80 | $251,278.50 |
| Christina Taylor | $25.00 | 1,593.1 | $39,827.50 |
| Marc Levine | $82.50 | 382.4 | $31,548.00 |
| | | **Total** | **$322,654.00** |

Thereafter, the balance of the discount ($82.50 per hour for Jennifer Eden and $25.00 for Christina Taylor would be paid first out of any funds collected over $1 million. This amount to be paid on any recovery over $1 million will include an additional premium (double any amount owed on discounted rate after first payment after $1 million in recovery). The amount of ½ of discounted rate plus 100[%] premium i.e., double the amount due after the recovery of $1 million will be due before any other payment of funds.

| Timekeeper | Rate | Number of Hours | Total Due |
|---|---|---|---|
| Jennifer Eden | $165.00 | 3,045.80 | $502,557.00 |
| Christina Taylor | $50.00 | 1,593.1 | $79,655.00 |
| Marc Levine | $165.00 | 382.4 | $63,096.00 |
| | | **Total** | **$645,308.00** |

*Id.* Based on these calculations, the Law Firm claimed that the Deferred and Premium Fees due under the Fee Agreement were $967,962.00. *Id.*

---

[2] The Client's argument that the hourly rate for Ms. Eden is $400.00 or $385.00 is without merit. *See* ECF No. [69] at 3 n.2. The Fee Agreement specifically notes that the rate for Ms. Eden was $450.00, and as such, the Law Firm's calculations with respect to the Deferred and Premium Fees are correct in that regard.

On April 23, 2020, Mr. Fajt sent a letter to Ms. Eden objecting to the Law Firm's demand for its Deferred and Premium Fees, as well as to the reasonableness of the attorneys' fees, the duplication of one of the invoices, and the addition of Mr. Marc Levine, a partner at the Law Firm, to the trial team.  ECF No. [68-5] at 69–74.  On May 28, 2020, Ms. Eden responded to Mr. Fajt, agreeing to a downward adjustment of $48,438.00 based on a duplicative invoice, an adjustment of Ms. Taylor's hours and an update to the discount on Mr. Levine's hourly rate.  *Id.* at 86.  As such, the total demand as to the Deferred and Premium Fees was reduced from $967,962.00 to $919,524.00.  *Id.*; *see* ECF No. [90-1] at 25.  The Law Firm claims that the Client owes the March 2020 invoice, the Deferred Fees, and the Premium Fees, totaling $1,072,724.99.  ECF No. [68–5] at 86.

### C.  The Enforcement Of The Fee Agreement Is Governed By Florida Contract Law.

A fee agreement is a contract between a law firm and its client and is interpreted and enforced in accordance with its plain language.  *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *16 (S.D. Fla. Oct. 26, 2004), *report and recommendation adopted*, 368 F. Supp. 2d 1296 (S.D. Fla. 2005) ("As is true for any contract, the interpretation of a contract for legal services requires an examination of the plain language of the purported agreement.") (citing *Eakin v. United Tech. Corp.*, 998 F. Supp. 1422, 1432 (S.D. Fla. 1998)).  In Florida, the common law affords attorneys the equitable remedy of a charging lien to secure their right to payment of their attorneys' fees and costs from a judgment or other recovery obtained as a result of their efforts in a lawsuit.  *Id.* at *14 (citing *Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom*, 428 So. 2d 1383, 1384 (Fla. 1983)).

Under Florida law, a charging lien may be imposed where (1) a fee contract exists between an attorney and client; (2) the attorney and client have an express or implied understanding that payment is dependent upon recovery in the lawsuit or that payment will come from the recovery;

(3) the client has attempted to avoid payment of the fee; and (4) the attorney has given timely notice of the charging lien. *Frank v. AGA Enterprises, LLC*, No. 17-CV-61373, 2021 WL 1960453, at *3 (S.D. Fla. May 17, 2021) (citing *In re Washington*, 242 F.3d 1320, 1323 (11th Cir. 2011)).  All that is required to perfect a charging lien is timely notice of the lien. *Id*.  In this case, each of the elements necessary for enforcement of the charging lien at issue have been met.  The Fee Agreement is an express contract between the Law Firm and the Client, the Fee Agreement expressly provides that payment comes from the settlement proceeds, the Client has attempted to avoid payments, and the Law Firm gave timely notice of the charging lien by virtue of its Notice of Charging Lien filed on March 13, 2020, ECF No. [55].

In addition, there is no dispute that the parties are bound by the terms of the Fee Agreement. Instead, the dispute here is centered on the Client's contention that the Law Firm breached the Fee Agreement and is not entitled to the amount of the charging lien.  To that end, the Client advances three arguments in support of its position: (1) that the Law Firm failed to comply with the budget as it was required to do, (2) that the Law Firm's billing records are improper given the Law Firm's excessive billing; and (3) that the Client was not aware that the Law Firm took a position with respect to the apportionment of damages, which resulted in years of unnecessary litigation for which the Law Firm should not be compensated.

### D. As To The Budgets, The Law Firm Did Not Breach The Fee Agreement.

In conjunction with the Fee Agreement, the Law Firm created two budgets—the May 2013 budget for the Damages Action (the "2013 Damages Action Budget"), and the July 2013 budget for the Bad Faith Action (the "2013 Bad Faith Action Budget").  ECF No. [68-2] at 48–52.  The 2013 Bad Faith Action Budget is not at issue as it was modified in 2019 (the "2019 Bad Faith Action Budget").  ECF No. [94] at 107:10–15.  There is no dispute that the Law Firm's fees, *in total*, exceeded the amounts proposed in the two budgets.  Indeed, the Law Firm estimated that

both actions would take no more than 2,255 hours.  In fact, from the time of the Fee Agreement in 2013 until the time the case settled in 2020, the Law Firm performed 5,040 hours of work on the matter.  Whether the Law Firm complied with the budgets is now at issue.

### 1. The 2013 Damages Action Budget

The 2013 Damages Action Budget estimated that 490 to 720 hours would be required to litigate the Damages Action through trial, estimating the total amount of attorneys' fees from $157,000.00 to $219,000.00.  ECF No. [68-2] at 49.  Specifically, the 2013 Damages Action Budget was presented to the Client as a chart including various stages of the case, with estimated hours, an hourly rate range, and an amount of estimated fees for each of those categories.  *Id*. at 48–49.  The chart provided to the Client is depicted below.

| PRE-DISCOVERY PHASE | | | |
|---|---|---|---|
| **ACTIVITY** | **ESTIMATED HOURS** | **HOURLY RATE** | **AMOUNT** |
| Preparing and responding to written discovery requests | 75-100 | $200 - $400 | $22,500-$30,000 |
| Litigating and discovery motions | 40-50 | $200 - $400 | $12,000-$15,000 |
| Preparing for depositions and defending depositions of attorneys and all persons on damage list (potentially 25 witnesses) | 80-120 | $200 - $400 | $24,000-$36,000 |
| Preparing John and Plaintiff's witnesses for deposition and defending their deposition | 30-40 | $200 - $400 | $9,000-$12,000 |
| **Total estimate through discovery** | **225-310** | **$200 - $400** | **$67,500- $93,000** |
| **TRIAL PREPARATION** | | | |
| **ACTIVITY** | **ESTIMATED HOURS** | **HOURLY RATE** | **AMOUNT** |
| Preparing witness lists and exhibit lists | 30-50 | $200-$400 | $9,000-$15,000 |

| Researching and briefing motions *in limine* and pre-trial briefs | 60-80 | $200-$400 | $18,000-$24,000 |
|---|---|---|---|
| Preparing witness Examination (direct and cross for 20 – 25 witnesses) | 60-90 (assumes exams prepared by our office) | $200-$400 | $18,000-$27,000 |
| Preparing trial exhibits and demonstrative aids | 10-20 | $200-$400 | $3,000-$6,000 |
| Participating in pre-trial conference | 5-10 | $200-$400 | $1,500-$3,000 |
| Preparing witnesses prior to testimony (20 – 25 witnesses) | 20-40 | $200-$400 | $6,000-$12,000 |
| Prepare opening and closing statement | 20-35 | $200-$400 | $6,000-$10,500 |
| **Total estimated budget for trial preparation** | **210-335** | **$200-$400** | **$61,000-$97,500** |
| **TRIAL** | | | |
| **ACTIVITY** | **ESTIMATED HOURS** | **HOURLY RATE** | **AMOUNT** |
| **Court time (1Attorneys, 3-5 days)** | **60-100** | **$200-$400** | **$18,000-$30,000** |
| **Total estimated budget through trial** | **490-720** | **$200-$400** | **$157,000-$219,000** |

*See id*.  As an initial matter, a plain reading of the 2013 Damages Action Budget shows that it was a very rough estimate and does not appear to have been an exacting or even careful attempt to calculate the costs of the litigation.  For example, the column labeled "amount" is not the product of the "estimated hours" and the "hourly rate" as one might expect.  Instead, the "amount" is just an estimated range with the high number being closer to a midpoint.  ECF No. [94] at 146:2–10. In responding to how the budget was prepared, Ms. Eden testified that, "given how far off the case had gone," she provided the Client with a rough budget "of where [she] saw it going."  *Id.* at 32:5– 11.  Despite its apparent and very rough format, no concern was lodged by the Client.

There is no dispute that the Law Firm exceeded the 2013 Damages Action Budget.  The Law Firm submitted, as requested by the undersigned, a specific assessment of how the invoiced

amounts compared to the 2019 Bad Faith Action Budget.  ECF No. [97–1] at 10–11.  Their billing, which was over budget on items (3), (4), (7), and (10), is categorized as follows:

| LINE ITEM | ESTIMATED HOURS | ACTUAL HOURS | ESTIMATED FEES | PAID |
|---|---|---|---|---|
| *Pre-Discovery Phase* | | | | |
| (1) Preparing and responding to written discovery requests | 75-100 | 83.3 | $22,500-$30,000 | $20,820.50 |
| (2) Litigating any discovery motions | 40-50 | 51 | $12,000-$15,000 | $13,540.00 |
| (3) Preparing for depositions and defending depositions of attorneys and all persons on damage list | 80-120 | 195.8 | $24,000-$36,000 | $52,463.00 |
| (4) Preparing John and Plaintiff's witnesses for deposition and defending their deposition | 30-40 | 144 | $9,000-$12,000 | $37,940.00 |
| **Total estimate through discovery** | 235-310 | 474.1 | $67,500-$93,000 | $124,763.50 |
| *Trial Preparation* | | | | |
| (5) Preparing witness lists and exhibit lists | 30-50 | 8.5 | $9,000-$15,000 | $2,177.50 |
| (6) Researching and briefing motions in limine and pre-trial briefs | 60-80 | 45.5 | $18,0000-$24,000 | $11,532.50 |
| (7) Preparing witness examination | 60-90 | 137.7 | $18,000-$27,000 | $37,169.50 |
| (8) Preparing trial exhibits and demonstrative aids | 10-20 | 24 | $3,000-$6,000 | $5,640.00 |
| (9) Participating in pre-trial conference | 5-10 | 3.7 | $1,500-$3,000 | $934.50 |
| (10) Preparing witnesses prior to testimony | 20-40 | 60 | $6,000-$12,000 | $15,670.00 |
| (11) Prepare opening and closing statement | 20-35 | 20.5 | $6,000-$10,500 | $5,342.50 |
| **Total estimate for trial preparation** | 210-335 | 299.9 | $61,500-$97,500 | $78,466.50 |
| (12) Trial – Court time (1 Attorney, 3-5 days) | 60-100 | 74.4 | $18,000-$30,000 | $19,429.00 |
| **Total estimate through trial** | 490-720 | 848.4 | $157,000-$219,000 | $222,659.00 |

*See id.*  In addition to the fact that the Law Firm exceeded the 2013 Declaratory Action Budget, the Law Firm also concedes that it rendered services for work not captured within any of the categories referenced in the budget.  ECF No. [94] at 112: 8–10.  Indeed, the amounts billed to these categories were significant, as the invoices from May 2013 through the end of the trial of the Damages Action in June 2016, the Law Firm billed the Client a total of 2,315.70 hours, thus exceeding the May 2013 budget by approximately 1,596 hours.  *See* ECF No. [90–1] at 27–28.

The Court finds that the Client not only agreed to the work that was above and outside of the 2013 Damages Action Budget projections, it also paid the Firm the invoices that detailed this work without any timely objection, and thereby, waived any objection to these amounts.  First, the Court credits Ms. Eden's testimony that she followed the procedure set forth by the Fee Agreement and advised the Client regarding departures from the budget.  ECF No. [94] at 110:8–114:6, 189:6–17.  Ms. Eden specifically stated that the Client was advised that the Law Firm's billing for categories captured in the budget were going to cost more than what was anticipated.  *Id.* at 112:6–22.  Ms. Eden specifically testified that although she exceeded the budget for items under trial preparation, including "preparing witness lists and exhibit lists," "researching and briefing motions *in limine* and pretrial briefs," "preparing witness examination," "preparing for pre-trial conference," and "preparing witnesses prior to testimony," she was in constant communication with the Client regarding these additional tasks and the impact they would have on the budget.  *Id.* at 192:1–196:8.  In support of the argument that the Client was aware of the work performed even before the invoices were received, Ms. Eden testified that she would have weekly, sometimes daily, communications with the Client regarding the work that the Law Firm was performing.  *Id.* at 113:15–114:1.

Indeed, not only was Ms. Eden's testimony credible, but the billing records also amply support her testimony that she was in regular contact with the Client regarding the case.

Specifically, the record supports the Law Firm's contention that the Client had an "intense and intimate knowledge of, and direct participation in, the nearly two decades of litigation" citing to the fact that there are almost two thousand e-mails between the Client and the Firm, in addition to regular conference calls and in-person strategy and preparation meetings. ECF Nos. [67] at 2; [67-1] at 1–32, 58–75, 77–91, 121–201, 204–23, 233–80.

As to the categories outside of the budget, there is ample support in the record for Ms. Eden's testimony that these matters were specifically discussed and approved by the Client: (1) Nova's appeal of the declaratory judgment action, ECF No. [67-1] at 111–147, 151–168; (2) the attorneys' fee award in the declaratory judgment action, *id.* at 162–234; (3) the Law Firm's defense to Nova's first argument, which was raised after the budget had already been created, *id.* at 4–105; (4) mediation and settlement discussions, *id.* at 88–102; (5) the review of several documents provided to the Law Firm by Bob Josefsberg, the lead attorney in the Client's criminal case, and conducting Mr. Josefsberg's *de bene esse* deposition as a result of his unavailability to testify at trial, *id.* at 8–173; and (6) engaging in numerous, indeed monthly, meetings and calls with the Client regarding case strategy, and research and analysis, *id* at 1–246.

Second, the invoices that contained the time and descriptions of the work performed on the Damages Action, as well as all the invoices but the last one submitted in 2020, were approved by the Client without any dispute. The invoices were provided to the Client, who admitted that it reviewed them each month. ECF Nos. [68-2] at 87–88; [94] at 213:6–22, 249:20–25. The evidence shows that the Client reviewed the invoices promptly, ECF No. [68–2] at 380–84; [94] at 231:4–19, no doubt because failure to pay within thirty days would result in the Client having to pay the Law Firm its full rates.

In fact, it was not until after the Damages Action concluded that the Client presented its first inquiry regarding the 2013 Damages Action Budget. ECF No. [93] at 15:1–16:10.

Specifically, Mr. Fajt testified that he questioned the Law Firm "with regards to the budget . . . travel expenses [and] travel billings."  *Id.* at 14:5–15:19.  He testified that he contacted the Law Firm asking questions about why the case had gone so far over budget.  ECF Nos. [94] at 44–45; [93] at 37:14–38:1.  Mr. Fajt also testified that the Client objected "to the invoice and to the entire billing for that three-year period from 2013, 2016."  ECF No. [93] at 38:2–6.

In response, on July 28, 2016, the Law Firm sent the Client a letter setting forth a detailed explanation of the reasons why the Law Firm's fees were well-above the estimate provided in the 2013 Damages Action Budget, explaining that the Client was intimately involved in the litigation, knew the work that had been put into the case, and that the case took longer to resolve and was more complex than expected.  ECF Nos. [68-2] at 93; [94] at 46:18–48:9; [93] 38:21–25.  Ms. Eden also explained the "very rough estimate of the litigation budget" did not anticipate many additional tasks that the Law Firm needed to perform to effectively represent the Client.  ECF Nos. [68-2] at 93; [94] at 31:25–32:17.  The Client did not object or respond to the Law Firm's July 28, 2016 response letter, and the Client continued to pay timely the invoices issued by the Law Firm.  ECF No. [94] at 112:25–113:6; [68-1] at 231.  Indeed, when Mr. Fajt was asked at the hearing, "[y]ou raised this objection five years ago and she wrote you this lengthy letter five years ago telling you the reasons the expenses were what they were. How did you respond to her? What's the response to this letter?"  ECF No. [93] at 40:5–8.  Mr. Fajt admitted, "I don't think we responded."  *Id.* at 40:9.   Mr. Fajt also testified that, other than the July 2016 objection, he did not recall any other written objections raised by the Client.  ECF No. [93] at 41:3–5.  As such, the 2016 inquiry by the Client regarding the 2013 Damages Action Budget, even if considered as an objection, was resolved to the Client's satisfaction as no other concern was ever raised until after the case settled in 2020 and the Client was asked to pay the Deferred and Premium Fees.

There is no question that the Fee Agreement required objections to the monthly bills within

30 days of the issuance of an invoice. ECF No. [68-2] at 38. Therefore, in accordance with the plain language of the invoice objections to the invoices were due within 30 days of receipt and a failure to raise an objection constitutes waiver. *See Franklin & Marbin, P.A. v. Mascola*, 711 So. 2d 46, 52 (Fla. 4th DCA 1998), *as corrected* (May 13, 1998) (concluding that a client's failure to comply with a fee agreement's terms requiring objections within a fixed time results in a waiver of objections). The Client's failure to make a timely objection is fatal, and a such, any objection now must be denied.

### 2. *The 2019 Bad Faith Action Budget*

The 2013 Bad Faith Action Budget was modified in April 2019 ("2019 Bad Faith Action Budget"). ECF No. [90-1] at 12–13. The 2019 Bad Faith Action Budget estimated that the fees required to litigate the Bad Faith Action through trial would be $614,000.00, as opposed to the $194,000.00 that had been previously estimated in hours. *Id.* at 13. Like the 2013 Damages Action Budget, the April 2019 Bad Faith Action Budget consisted of very rough calculations over various categories. *Id.* at 12–13. Despite the very rough nature of the chart the Law Firm provided and the fact that the Law Firm had exceeded the 2013 Damages Action Budget, the Client did not object nor seek any further detail to the 2019 Bad Faith Action Budget. The 2019 Bad Faith Action Budget that was provided to the Client was as follows:

| PRE-DISCOVERY PHASE | | | |
|---|---|---|---|
| ACTIVITY | ESTIMATED HOURS | HOURLY RATE | AMOUNT |
| (1) Preparing and responding to written discovery requests | 100-200 | $200-$400 | $20,000-$80,000 |
| (2) Litigating and discovery motions | 80-100 | $200-$400 | $16,000-$40,000 |

| (3) Preparing for depositions and defending depositions of attorneys and all persons on damage list | 160-250 | $200-$400 | $100,000 |
|---|---|---|---|
| (4) Preparing John and Plaintiff's witnesses for deposition and defending their deposition | 30-40 | $200-$400 | $6,000-$16,000 |
| **Total estimated budget through discovery** | **370-590** | $200-$400 | **$74,000-$236,000** |
| **TRIAL PREPARATION** | | | |
| (5) Preparing witness lists and exhibit lists | 60-100 | $200-$400 | $12,000-$40,000 |
| (6) Researching and briefing motions *in limine* and pre-trial briefs | 120-160 | $200-$400 | $24,000-$64,000 |
| (7) Preparing witness examination | 120-180 | $200-$400 | $24,000-$72,000 |
| (8) Preparing trial exhibits and demonstrative aids | 30-50 | $200-$400 | $6,000-$20,000 |
| (9) Participating in pre-trial conference | 10-15 | $200-$400 | $2,000-$6,000 |
| (10) Preparing witnesses prior to testimony | 40-80 | $200-$400 | $8,000-$32,000 |
| (11) Prepare opening and closing statement | 40-60 | $200-$400 | $8,000-$24,000 |
| **Total estimated budget for trial preparation** | 420-645 | $200-$400 | $84,000-$258,000 |
| **TRIAL** | | | |
| (12) Court time (2 Attorneys, 5-10 days) | 180-300 | $200-$400 | $26,000-$120,000 |
| **Total estimated budget through trial** | 970-1,535 | $200-$400 | $194,000-$614,000 |

*See id*.  The Law Firm submitted, as requested by the undersigned, a breakdown of how the invoiced amounts compared to the 2019 Bad Faith Action Budget.  ECF No. [97-1] at 13–14.  That chart shows that although the Law Firm's invoices did not exceed the total amount of estimated fees, they exceeded the amount as to three categories:

| | ESTIMATED HOURS | ACTUAL HOURS | ESTIMATED FEES | PAID |
|---|---|---|---|---|
| *Pre-Discovery Phase* | | | | |

| | | | | |
|---|---|---|---|---|
| (1) Preparing and responding to written discovery requests | 100-200 | 146.5 | $20,000-$80,000 | $40,907.50 |
| (2) Litigating and discovery motions | 80-100 | 16.8 | $16,000-$40,000 | $4,513.00 |
| (3) Preparing for depositions and defending depositions of attorneys and all persons on damage list | 160-250 | 496.9 | $100,000 | $136,216.50 |
| (4) Preparing John and Plaintiff's witnesses for deposition and defending their deposition | 30-40 | 57.3 | $6,000-$16,000 | $15,275.50 |
| **Total estimate through discovery** | 370-590 | 717.5 | $74,000-$236,000 | $196,912.50 |
| *Trial Preparation* | | | | |
| (5) Preparing witness lists and exhibit lists | 60-100 | 8.8 | $12,000-$40,000 | $2,068.00 |
| (6) Researching and briefing motions *in limine* and pre-trial briefs | 120-160 | 290.5 | $24,000-$64,000 | $76,682.50 |
| (7) Preparing witness examination | 120-180 | 37.7 | $24,000-$72,000 | $10,744.50 |
| (8) Preparing trial exhibits and demonstrative aids | 30-50 | N/A | $6,000-$20,000 | N/A |
| (9) Participating in pre-trial conference | 10-15 | N/A | $2,000-$6,000 | N/A |
| (10) Preparing witnesses prior to testimony | 40-80 | N/A | $8,000-$32,000 | N/A |
| (11) Prepare opening and closing statement | 40-60 | N/A | $8,000-$24,000 | N/A |
| **Total estimate for trial preparation** | 420-645 | 337 | $84,000-$258,000 | N/A |
| (12) Trial – Court time (2 Attorneys, 5-10 days) | 180-300 | N/A | $26,000-$120,000 | N/A |
| **Total estimate through trial** | 970-1,535 | 1,054.5 | $194,000-$614,000 | $286,407.50 |

In addition, as with the Damages Action, the Law Firm again rendered significant services for work not captured within any of the categories in the 2019 Bad Faith Action Budget. ECF No. [94] at 61:2–63:18. According to the invoices from April 2019 through March 6, 2020, the Law

Firm billed a total of 1,879 hours for the Bad Faith Action, approximately three hundred hours over what was estimated. ECF No. [90-1] at 27–28. However, because the Fee Agreement reduced the hourly rate for Ms. Eden and Ms. Taylor, the amount billed to the Client was approximately $505,825.00. *Id.* at 28.

Unlike the Damages Action, Ms. Eden testified that she did not seek specific approval for any of the items that were over or outside of the 2019 Bad Faith Action Budget. ECF No. [94] at 189:6–10. Ms. Eden testified that because they were using her discounted rates to track the amount the Law Firm billed, the matter, by the Law Firm's calculation, was never over the 2019 Bad Faith Action Budget. *Id.* at 134:22–25, 157:21–25. Nevertheless, Ms. Eden testified that the Client was well-aware of the time being spent on the matter, did not object to any of the work they performed, and paid the invoices in a timely manner. *Id*. at 128:23–129:19; 159:9–160:20.

First, the Court considers whether the invoices for the Bad Faith Action were more than the amounts budgeted as set forth in the 2019 Bad Faith Action Budget. The Law Firm contends that they were within the budget. Indeed, although the Fee Agreement tasks the Law Firm with keeping track of the budgets, the Client twice inquired as to whether the Law Firm was on budget for the Bad Faith Action. On December 30, 2019, Mr. Grunow sent an email requesting, among other things, that the Law Firm provide the Client with a 2020 legal budget to gauge "future cost in terms of time and money." ECF No. [68-2] at 384. Ms. Eden responded that same day, explaining that "[a] budget was given to [the Client] a few months back and has not changed." *Id.* at 382. And then, on March 18, 2020, the Client specifically inquired as to the whether they were on budget. ECF No. [68-5] at 17–19. The Law Firm responded by stating that "[e]verything was done under the budget up through the trial costs." ECF No. [90-1] at 20. Specifically, the Law Firm sent the Client a spreadsheet showing a total invoice for $465,585.42, representing an amount that was within the amount budgeted for the entire action ($614,000.00). *Id.* at 23.

The Client advances the argument that when it inquired as to the budget and was told that the Law Firm was not over the budget, it in fact was over because the billed amount had to be calculated, for purposes of determining if the matter was within budget, with the full hourly rate of the lawyers, not the discounted rate provided for in the Fee Agreement.  ECF No. [69] at 8–10. Indeed, if the Law Firm had used their full hourly rates to calculate whether they were within budget, they would have concluded that in fact they were already over the budget.  Moreover, the Law Firm should have reviewed the matter by the categories that were set out as there were large categories, like the trial, that had not yet occurred.  Therefore, to suggest that the case was within budget was misleading.  In response, the Law Firm contends that that the 2019 Bad Faith Action Budget was intended to reflect the estimated fees based on the discounted rates.  As such, the Law Firm contends that "staying within budget" only required that the fees billed, using the discounted rate, not exceed the estimated range provided for in the Budget.  ECF No. [67] at 14–15.

The Court finds that the Law Firm's use of the discounted rates in determining whether it was within the 2019 Bad Faith Action Budget is the most reasonable interpretation of the 2019 Bad Faith Action Budget, and therefore, the Law Firm's work did not exceed that budget.  Ms. Eden's testified that she assumed the discounted rates were to be used in determining whether they were within budget because that was the issue that the Client was most concerned about—how much money the Client needed to have on hand to pay the invoices in a timely fashion.  ECF No. [94] at 138:20–140:7.  Indeed, calculating the budget on the actual hourly rate of the lawyers, as opposed to the discounted rate, would make little sense because the actual rate was not being paid by the Client.  The operative numbers were (1) the discounted rate which had to be paid within thirty days of the invoice or the Client would forfeit the right to defer paying, and (2) the difference between the discounted and the actual rate which needed to be paid in the event of a settlement and was necessary in determining the amount for the Premium Fee.  Having found that the Law

Firm correctly used the discounted rate to determine whether the case was under budget, the Court finds that the Law Firm did not breach the Fee Agreement as to the 2019 Bad Faith Action Budget.

In addition, given the rough nature of the budgets that were prepared the Court rejects the Client's contention that the Law Firm needed to consider the categories and whether the categories were over budget. There appears to be no such obligation set forth in the Fee Agreement. To the contrary, the Fee Agreement merely provides that if a cost or task might take the matter above the budget in a "meaningful way," the Client would decide whether to incur the additional costs. ECF No. [90-1] at 5. Moreover, if the Law Firm failed to advise the Client in advance of a "meaningful" departure from the budget, the amount of the bill that exceeds the budget would have to "be discussed" and the parties would "have to mutually agree on an equitable resolution of such excess." *Id.* In short, the Client's interpretation of the Law Firm's obligations with respect to the budget is not supported by the language Fee Agreement.

Notwithstanding, even if the Court adopted the Client's reasoning and the Bad Faith Action was over budget, the Court credits the testimony of Ms. Eden and finds that any work performed with respect to the Bad Faith Action was approved by the Client, constituting a modification of the budget as contemplated by the Fee Agreement itself. Indeed, whether within or over the budget, the work was detailed in the monthly invoices and no invoice, except for the last one in March 2020, was ever objected to as required by the Fee Agreement. Moreover, as to the work performed outside the categories in the 2019 Bad Faith Action Budget, the record supports the finding that the Client was aware of and approved the work done. Specifically, this includes all entries relating to (1) the motion to lift stay, ECF No. [67-1] at 147–198; (2) vetting expert witnesses and consulting experts and expert witness discovery, *id.* at 200–243; (3) participating in meetings, calls, strategy sessions, and research and analysis of issues requested or raised by the Client, *id.* at 190–246; (4) locating and obtaining affidavit testimony from Wormmy's principal,

23

*id.* at 241–42; (5) mediation, *id.* at 234–245; and (6) preparing miscellaneous matters like a motion to continue trial and securing substitute witnesses to testify on the reasonableness of the settlement in the event the motion was denied, *id*. at 215–16, 232, 241.  The record shows that each was approved as evidenced by the fact that invoices were paid in full and the extensive meetings, calls, and strategy sessions with the Client.

Moreover, as to the last invoice, the only one that was challenged by the Client since the Fee Agreement in 2013, the Client raised its objections after the thirty days required by the Fee Agreement.  Indeed, the last invoice for February 2020 time was sent to the Client on March 6, 2020.  ECF No. [94] at 151:17–20.  The Client did not object until April 23, 2020, and only after the Law Firm disclosed the full amount that was owed under the Fee Agreement.  ECF No. [68–5] at 69–74.  The undersigned also notes that the Client repeatedly told the Law Firm that it would pay what was owed under the Fee Agreement only to launch a myriad of stale objections six weeks after the final invoice and Deferred and Premium calculations were provided.  ECF No. [68-5] at 12, 31, 64.  Here, the Client did not object to this invoice within the required thirty-day period, and therefore, any objection to that invoice is waived.

### E.  The Argument That The Law Firm's Invoices Were Unreasonable Is Of No Merit, And In Any Event, Such Argument Was Clearly Waived.

The Client argues that the Law Firm's billing records are improper given the Law Firm's excessive billing.  ECF No. [69] at 10.  Specifically, the Client contends that the Law Firm billed substantial hours without providing any detail of the actual legal services being performed, engaged in gross overbilling, and included numerous billing entries for ministerial functions or paralegal tasks.  *Id.* at 11–12.  The Client argues that the Law Firm's excessive billing stemmed, in part, from (1) its decision to have three attorneys attend every deposition taken from December 2019 through February 2020; (2) billing generic time entries for substantial blocks of time without

providing any indication of the actual work performed; and (3) abusive overbilling for tasks that should have required only a fraction of the time billed. *Id.* at 11–13.

As an initial matter, and as discussed above, the matter before the Court is indisputably one that sounds in contract, and as such, what is a reasonable fee is not the issue before the Court. To support its contention that the Court should look beyond the Fee Agreement to determine the Law Firm's reasonable fee, the Client relies on *Haines v. Sophia*, 711 So. 2d 209 (Fla. 4th DCA 1998). However, *Haines* is easily distinguishable from the circumstances presented in this case. In *Haines*, a law firm provided legal services in a family law case until it was discharged by the client. 711 So. 2d at 209–10. The fee agreement between the parties provided that upon discharge, "the amount of the fees and costs due [was to be] determined in the same action before suit is dismissed or concluded." *Id.* at 210. The Fourth District Court of Appeal concluded that the trial court correctly assessed the reasonableness of the fees requested because the fee agreement called for the court to determine the amount. *Id.* at 210–11. Unlike *Haines*, the Firm here was not discharged, but instead it fully performed under the Fee Agreement, and as such, its rights and obligations are guided exclusively by the terms of the Fee Agreement.

Unlike a fee award to a third-party resulting from a fee-shifting contract or statutory provision, a charging lien is a matter of contract such that an attorney is not required to establish the reasonableness of the fee requested. *Rodriguez v. Altomare*, 261 So. 3d 590, 592 (Fla. 4th DCA 2018) (holding that a charging lien is based on the agreement between the parties and not an amount the court finds to be reasonable) (citing *Gossett & Gossett, P.A. v. Mervolion*, 941 So. 2d 1207, 1209 (Fla. 4th DCA 2006)); *Universal Beverages Holdings, Inc. v. Merkin*, 902 So. 2d 288, 290 (Fla. 3d DCA 2005) (noting that in a fee dispute between attorney and client, the attorney "was not legally required to provide a detailed accounting of the services rendered and the number of hours expended"). Indeed, the Client presented no case law to support its position that the Court

25

can review the "reasonableness" of the attorneys' fee when there has been an agreement between the parties as to the amount to be paid, and as here, the matter has progressed to the discharge of a lien.  As such, the reasonableness of the attorneys' fees is not the issue before this Court.

Nevertheless, even if the Court were charged with reviewing the reasonableness of the fees, the Client would have waived its objections in this regard long ago.  Indeed, the Court finds that the Client failed to object to the invoices in a timely manner, and as such, any objection is waived. After the Parties entered into the Fee Agreement, the Law Firm delivered its monthly invoices to the Client accompanied by a cover letter from Ms. Eden.  ECF No. [90-1] at 77–85.  The monthly invoices each contained detailed time entries for that month, the total number of hours spent, and the total fees incurred prior to application of the discounted rates.  *Id.*  Ms. Eden's cover letters that accompanied the Law Firm's invoices each month contained a breakdown of the number of hours billed by Ms. Eden and Ms. Taylor that month (and by Mr. Levine starting in November 2019), and a calculation of the discounted fees due (at $285.00 an hour for Eden and $235.00 an hour for Taylor) if the invoice was paid within thirty days.  *Id.* at 77.  The discounted fees reflected in Eden's cover letters were the amounts that the Client was required to pay within thirty days to avoid forfeiting the agreed discounted rates on future bills.  *Id.*

The Client's argument that the invoices did not adequately advise them of the Deferred Fee or of the hourly rates is also unpersuasive.  Not only did the Fee Agreement not require that information, a reverse calculation of the time and fee entries shows that the monthly invoices reflected the hourly rates at which Eden and Taylor were billed.  *Id.* at 27–28.  The Client admitted that, because each monthly invoice under the Fee Agreement included a cover letter detailing the total number of hours billed by each attorney for the month and the discounted rate, the Client could have performed the simple mathematical exercise to be able to calculate the amount of Deferred Fees it would owe the Firm if it obtained a recovery above or below $1 million pursuant to the

26

express written contract between the parties.  ECF No. [94] at 102:24–103:1.  As such, the record is clear that the Law Firm sent its invoices in a timely manner and that the Client paid each invoice, except for the last invoice, without any objection.

Moreover, the Client's contention that it was unaware of the Deferred or Premium Fees is completely misplaced.  Indeed, in its proposal to the Firm presenting the tiered fee structure, Mr. Fajt stated, "[i]f we were to recover only $1 million, that would be a financial disaster to John and your firm would have received 75% of the fees going forward. I would like to think a meaningful bad faith recovery is the most probable scenario in which case you will receive a very handsome premium for agreeing to defer a portion of your fees." ECF No. [90-1] at 8–9.  Based on the Client's own calculations presented to the Firm, the cumulative sum of the Deferred and Premium Fees was a separate consideration from the budget, as the Firm would be entitled to recover significantly more than the Client under the Client's established benchmark, even if the Firm did not exceed any budget amount and no additional work not captured within the budget was performed. If the Firm recovered less than $1 million and did not bill any hours outside of the budget estimates, then the Firm would receive total fees of $828,712.50 and the Client almost nothing.   If the Firm recovered just one dollar over $1 million, then Firm would receive a total of $1,200,787.50, with zero to the Client.  The Client was well aware of how the Fee Agreement worked, and how the Deferred and Premium Fees might impact their recovery.

The fact that the Law Firm was not providing a running total of those amounts is not only irrelevant, it was not required by the Fee Agreement, nor can it be said to have prejudiced the Client in any way.  The Client admitted it reviewed the invoices each month and the invoices were provided to both Mr. Fajt and Mr. Grunow. ECF Nos. [68-2] at 87–88; [94] at 213:6–22, 249:11–25.  The emails in evidence confirm the Client reviewed the invoices promptly upon receipt, and the Client was thus contemporaneously aware of the legal work being done by the Firm. ECF Nos.

[67-4]; [94] at 231:4–19.  Likewise, the fact that the Client chose to settle the matter without calculating the Deferred or Premium Fee was its choice and is not a basis to deny those payments.

The Client's position that it believed that it would still be able to challenge these invoices at a later time is also entirely unpersuasive.  Indeed, Mr. Fajt's testimony that he believed that he would still be able to object to the bills was simply not credible.  Mr. Fajt, who is a sophisticated professional and a lawyer by training, testified that he reviewed the bills on a monthly basis.  ECF No. [94] at 203:18–24.  His testimony now that he did not pay close attention to them and just assumed that he could challenge them later is not credible given that he was the one that proposed the procedures for challenging the invoices in the first place.  ECF No. [93] at 36:11–37:13.  If the bills were unreasonable, the Client had the opportunity, the ability, and the information necessary to challenge them within the time frame that it set out under the Fee Agreement.  Instead, it raised a concern over the amounts billed *once* years after the invoices were approved and paid, and now seeks to challenge this time again, four years after that part of the case concluded.  The Fee Agreement set out the time for these objections, and the Client did not object in a timely manner.

Finally, the Client argues that the Fee Agreement is unenforceable because it is clearly excessive as defined by Rule 4–1.5, Rules Regulating the Florida Bar.  Indeed, Rule 4–1.5(d) provides that fee agreements between a lawyer and a client are enforceable according to their terms "unless found to be illegal, obtained through advertising or solicitation not in compliance with the Rules Regulating The Florida Bar, prohibited by this rule, or clearly excessive as defined by this rule."  Rule 4–1.5(a) provides that a fee is clearly excessive when:

> (1) after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee or the cost exceeds a reasonable fee or cost for services provided to such a degree as to constitute clear overreaching or an unconscionable demand by the attorney; or

> (2) the fee or cost is sought or secured by the attorney by means of intentional misrepresentation or fraud upon the client, a nonclient party, or any court, as to either entitlement to, or amount of, the fee.

In *Franklin & Marbin, P.A.*, the Fourth District considered whether "a deal is a deal," or whether a trial court could examine a fee agreement between a firm and a client for reasonableness. 711 So. 2d at 48. The legal services at issue were billed to the client, who did not object to any of the entries. *Id.* In the firm's view, the failure to object to the invoices made the client responsible for the full amount billed in accordance with the fee agreement. *Id.* As an initial matter, the court noted that the parties entered into a periodic fee agreement in which the client was obligated to object in writing within a specific period of time. *Id.* at 51. Thus, the court concluded that "the client's failure to object seasonably to the hours as they were billed would waive any objection to the number of hours billed and would operate as a tacit admission of the reasonability thereof in a later suit for a money judgment under the contract." *Id.* at 52. The court explained that the objection period was important because it ensured that the costs of litigation did not rise beyond the client's ability to pay, but also ensured that the firm would not later be faced with "after-the-fact objections." *Id.* Moreover, the court noted that the disciplinary Rules Regulating the Florida Bar did not "cannot–and, indeed, do not–supplant this kind of fee agreement with a client and may not be used to 'reform an otherwise valid retainer agreement between an attorney and a client.'" As such, the Court concluded that the terms of the fee agreement controlled. *Id.* at 52.[3]

The Client's argument that fees sought are clearly excessive and egregious pursuant to Rule 4–1.5 is bellied by the record. First, the Client is sophisticated; in his letter objecting to the final invoice on behalf HCP, Mr. Fajt states that he has been in the "commercial and legal workplace" for over 40 years and has been transacting business with the Firm for over 15 years. ECF No. [68-

---

[3] The court ultimately reversed, on an unrelated ground, concluding that a charging lien could not be imposed by the firm until a money judgment was entered. *Franklin*, 711 So. 2d at 53–54.

5] at 69.  Moreover, it was the Client who initiated negotiations regarding the modifications to the Fee Agreement based on a "partial contingency based [] formula [he] successfully used on several occasions with other law firms."  ECF No. [90-1] at 8.  As such, the Client cannot now claim that the premium he negotiated is egregious.  Simply put, the record here does not support a finding that the fee requested is clearly excessive because there was simply no overreaching, unconscionable conduct, misrepresentation, or fraud.  Instead, the Fee Agreement was negotiated with the Client over the course of various communications.  The Client clearly understood the implications of the terms.  Accordingly, the Court rejects the suggestion that it should somehow re-write the terms of the Fee Agreement.

Indeed, based on the undersigned's review of the record, and with the benefit of the testimony from Mr. Fajt and Ms. Eden, there can be no credible argument that the Client was unaware of the impact of the Fee Agreement, the merits of its case, the work the Law Firm was doing, the details of the invoices, or quite frankly, any other issue of relevance to this matter.  Not only was the Client intimately involved in the case, Mr. Fajt was reviewing every invoice before payment.  Indeed, this is not a case where the invoices were being paid by an office manager or an accounting department without any benefit of review.  Mr. Fajt, and to some extent Mr. Grunow, were not only involved in every aspect of the case, but they also managed the case from a financial perspective as well.  Indeed, they reaped the benefits of the Fee Agreement, by not paying a significant portion of their legal fees for almost seven years, and now want to deprive the Law Firm of its fee and the Premium it contracted for in return for waiting this long for its payment.  There is no reason to allow the Client to do so.[4]

---

[4] It should also be noted that in connection with the attorneys' fees to be awarded in the Declaratory Judgment Action and related appeals, the Law Firm and the Client performed an extensive review of the Law Firm's invoices in 2019 in order to prepare an attorneys' fee affidavit to be filed in the Declaratory Judgment Action.  The Client specifically inquired whether the Deferred Fees and

### F.  Mr. Levine's Time Is Not Part Of The Fee Agreement.

Finally, the Client objects to the work performed by Marc Levine, a partner at the Law Firm.  Specifically, Mr. Levine billed approximately 382.4 hours from December 2019 through March 2020.  ECF No. [90–1] at 28.  The Court finds that although the fees already paid for his time are supported by the record, Deferred and Premium Fees for Mr. Levine are not.

As an initial matter, the Client certainly knew that Mr. Levine was on the trial team because Mr. Fajt interviewed him and approved invoices with his time.  ECF No. [67-10] at 1–2.  As such, the time already paid should not be at issue.

However, there was no agreement to add him to the Fee Agreement.  Instead, the Law Firm simply added him by discounting his hourly rate and seeking his full rate and a premium for that time now.  There is no basis for the Law Firm to have added him to the Fee Agreement.  Indeed, as Ms. Eden testified to at the hearing, there is no language in the Fee Agreement that would authorize the Law Firm "to apply the enhancement under [the Fee Agreement] to somebody else at the [Law] Firm. . . ."  ECF No. [94] at 184:18–185:6.

Finally, the Law Firm did not provide any information as to Mr. Levine's experience or other information for the Court to find that he would be entitled to the $390.00 hourly rate.  As such, and on this record, the Court cannot award Mr. Levine his proposed hourly rate, he can only recover the amounts as billed and already paid by the Client.  Therefore, the amount the Law Firm seeks must be reduced both for the difference between Mr. Levine's hourly rate and billed rate ($105.00 x 382.4=$40,152.00) and the Premium Fee (100% of the ½ discounted rate=$20,076.00) which totals $60,228.00.

---

Premium Fees could be recovered in the fee award, as it wanted to recoup as much as possible from Nova.  ECF Nos. [94] at 140:8–141:3; [68–1] at 262; [68–2] at 350–55; [90–1] at 47–50.

### G.  The Client's Argument That It Did Not Have Notice Of The Apportionment Issues Is Irrelevant, And Entirely Unpersuasive.

Finally, the Client argues that the Law Firm "wasted nearly three years, and hundreds of thousands of dollars in fees billed" in arguing against Nova's request to have the amount of covered damages determined by the trial court.  ECF No. [69] at 6.  Specifically, the Client argues that the Law Firm failed to identify a "a crucial insurance law issue regarding the requirement to apportion damages as between those covered and not covered under Nova's insurance policy." *Id*. at 13.  As such, the Client contends that the Law Firm advanced an argument that was contrary to its interest and could have been fatal to the Bad Faith Action had the case not been settled.  *Id*. at 6, 15.  The Law Firm not only disputes the merits of the claim, but also notes that the Client was in fact well aware of this issue.  ECF No. [94] at 77:25–78:5.

 The Client's argument that the Law Firm took ill-advised legal positions is not, even if true, a valid basis for challenging the Law Firm's entitlement to the fees owed under the Fee Agreement.  The Client's argument that the Court review the appropriateness of certain legal positions taken, or not, in a state court insurance action is nothing more than another attempt at having the Court determine the "reasonable fee" as opposed to whether the Fee Agreement was breached and whether the resulting lien is enforceable.  The Court declines to review this issue any further.  The record is replete with evidence that the Client supervised this case with excruciating attention to detail, was highly sophisticated and sufficiently informed as to appreciate the significance of every step the Law Firm took in this case, and in fact, approved the Law Firm's work on a monthly basis.  Indeed, there is no evidence that the Law Firm ever took a position, or made an argument, without consultation and approval from the Client.  The Client's argument in this regard, as with almost all the others presented, appears to be based solely on its desire to avoid paying the amounts it not only agreed to pay, but that it proposed to pay when it

offered the Law Firm a modified contingency in the first place. As a result of the Fee Agreement, the Client enjoyed seven years of reduced rates in excess of half a million dollars. That was a benefit that the Client enjoyed at a significant risk to the Law Firm. Given the sizeable nature of the settlement, the Law Firm is not only entitled to be paid for the hours that it worked and that were approved, but it also has a claim to the Premium Fees that the Client offered in return for only paying a reduced hourly rate for seven years.

## IV. RECOMMENDATION

In accordance with the foregoing, the undersigned hereby **RECOMMENDS** that the Law Firm's Amended Motion, ECF No. [67], be **GRANTED IN PART AND DENIED IN PART**. The Law Firm is entitled to $1,012,469.99, which constitutes the full amount of the lien, minus $60,228.00, which is attributable to Mr. Levin's time.[5]

---

[5] The Court also finds that the Law Firm is entitled to pre-judgment interest from April 14, 2020, the date the Client received the proceeds of the settlement. As the Client notes, prejudgment interest "is allowed only on liquidated claims." *Cioffe v. Morris*, 676 F.2d 539, 543 (11th Cir. 1982) (citing *Town of Longboat Key v. Carl E. Widell & Son*, 362 So. 2d 719 (Fla. 2d DCA 1978)). A claim is liquidated when it involves a sum certain, notwithstanding any bona fide dispute as to the amount owed. *Id.* (citing *Broward County v. Sattler*, 400 So. 2d 1031, 1033 (Fla. 4th DCA 1981)). In *Cioffe*, the court concluded that the plaintiff was entitled to prejudgment interest on its damages under an installment contract because the amount due for a particular installment was liquidated. *Id.* Here, as in *Cioffe*, the Law Firm's claim for attorneys' fees is liquidated because it involves the amount of fees due under the Fee Agreement. The fact that the amount due is contested is a non-issue because the Fee Agreement contemplates payment of a sum certain amount. Accordingly, the Law Firm is entitled to an award of pre-judgment interest from the time the Client received the settlement proceeds. *See Mariposa Associates, Ltd. v. Regions Bank*, No. 13-23838-CIV, 2018 WL 4208251, at *1 (S.D. Fla. July 26, 2018) (concluding that pre-judgment interest accrued from the date the court conclusively rules in a party's favor) (*citing TYR Tactical, LLC v. Protective Prod. Enterprises, LLC*, No. 15-CV-61741, 2018 WL 2672391, at *1 (S.D. Fla. June 5, 2018)); *McCarthy v. Estate of Krohn*, 16 So. 3d 193, 195 (Fla. 4th DCA 2009) (concluding that a law firm was entitled to prejudgment interest from the date its client received the proceeds from its settlement because the fee agreement provided that fees were contingent on recovery).

## V.  OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation within **TEN (10) DAYS** of the filing of this Report and Recommendation.  Because the Court heard argument and allowed the parties to submit proposed order specifically addressing the matters presented here, the undersigned finds that ten days is sufficient time for the parties to file their objections.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).  Any request for additional time in which to file objections must be made within **FIVE (5) DAYS** of this date of this Report and Recommendation.

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 13th day of August, 2021.

_____
JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE